# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM 39161**

————————————

**UNITED STATES**
*Appellee*

**v.**

**Ladarion D. STANTON**
Airman First Class (E-3), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 7 February 2018

————————————

*Military Judge:* J. Wesley Moore.

*Approved sentence:* Dishonorable discharge, confinement for 96 months, forfeiture of all pay and allowances, reduction to E-1, and a reprimand. Sentence adjudged 10 June 2016 by GCM convened at Joint Base Andrews, Maryland.

*For Appellant:* Lieutenant Colonel Nicholas W. McCue, USAF; Major Annie W. Morgan, USAF; Brian L. Mizer, Esquire.

*For Appellee:* Major Mary Ellen Payne, USAF; Major Meredith L. Steer, USAF; Captain Sean J. Sullivan, USAF.

Before JOHNSON, MINK, and DENNIS, *Appellate Military Judges*.

Senior Judge JOHNSON delivered the opinion of the court, in which Judge MINK and Judge DENNIS joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 18.4.**

————————————

JOHNSON, Senior Judge:

Appellant was found guilty by a military judge, in accordance with his pleas, of one specification of larceny of non-military property in violation of

Article 121, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 921. In addition, a general court-martial composed of officers convicted Appellant, contrary to his pleas, of two specifications of sexual assault and one specification of aggravated sexual contact in violation of Article 120, UCMJ, 10 U.S.C. § 920.[1] The court-martial sentenced Appellant to a dishonorable discharge, confinement for 96 months, total forfeiture of pay and allowances, reduction to the grade of E-1, and a reprimand. The convening authority approved the sentence as adjudged.

Appellant raises five assignments of error for consideration on appeal: (1) The military judge erroneously instructed the court members regarding propensity pursuant to Military Rule of Evidence (Mil. R. Evid.) 413; (2) The military judge informed the court members over Defense objection that Appellant had been awarded 140 days of confinement credit for illegal pretrial punishment; (3) Appellant is entitled to additional confinement credit for outrageous Government conduct; (4) Appellant has been denied his due process right to timely appellate review; and (5) The military judge abused his discretion by admitting uncharged propensity evidence under Mil. R. Evid. 413. We find Appellant is not entitled to additional confinement credit, nor has he been denied his due process right to timely appellate review, and we affirm his Article 121 conviction. However, in light of our superior court's holding in *United States v. Hills*, 75 M.J. 350 (C.A.A.F. 2016), we must set aside Appellant's Article 120 convictions and his sentence; accordingly, we do not address the remaining assignments of error.

## I. BACKGROUND

Appellant entered mixed pleas at his court-martial. He pleaded guilty to stealing a set of headphones and an iPad, valued at under $500.00, from a dormitory room while performing bay orderly duties on Joint Base Andrews, Maryland. The military judge accepted the plea and entered a finding of guilty as to that charge and specification (Charge III).

Appellant pleaded not guilty to the following offenses: one specification of attempted forcible sodomy (Charge I) and two specifications of sexual assault

---

[1] *Sua sponte*, pursuant to Rule for Courts-Martial 917 the military judge entered a finding of not guilty of one specification of attempted forcible sodomy in violation of Article 80, UCMJ, 10 U.S.C. § 880. The court members also found Appellant not guilty of two specifications of abusive sexual contact in violation of Article 120, UCMJ, 10 U.S.C. § 920.

by causing bodily harm against Airman First Class (A1C) CB (Charge II, Specifications 1 and 2); one specification of abusive sexual contact against A1C AV (Charge II, Specification 3); and one specification of abusive sexual contact and one specification of aggravated sexual contact against Senior Airman (SrA) TDD (Charge II, Specifications 4 and 5).[2] All of the alleged sexual offenses occurred at Joint Base Anacostia-Bolling, District of Columbia, and all three of the alleged victims were members of Appellant's unit, the Air Force Honor Guard. At trial, the parties presented evidence as described below.

## A. A1C CB

A1C CB testified that in June 2015 she attended a party at the on-base home of A1C JA, another female member of the unit. A1C JA, Appellant, and two other Honor Guard Airmen were also present. A1C CB described Appellant as a good friend with whom she had a "brother/sister relationship." After dancing and drinking alcohol for a period of time, A1C CB felt drowsy and her vision became blurry. She attempted to go upstairs to rest but, finding it difficult, stopped and rested on a landing. Shortly thereafter, Appellant helped her up the stairs, led her to a room without furniture, and laid her on the floor. Appellant locked the door, removed A1C CB's pants, digitally penetrated her vagina, and then penetrated her vagina with his penis for approximately ten minutes. A1C CB testified she told him "no" one time "very faint[ly]," but otherwise "froze" during the assault. It was painful and A1C CB began crying softly. She tried to "scoot" away from Appellant on the floor but was unable to get away from him, in part because Appellant's hand was on her hair. A1C CB testified that at one point Appellant removed his penis, touched her mouth with it, and told her to perform oral sex; she turned away and shook her head, and he resumed penetrating her vagina.

A1C CB testified the assault ended when A1C JA attempted to open the locked door. Appellant stopped, began dressing himself, and told A1C CB to put her clothes on. Appellant unlocked the door and A1C JA entered. A1C JA guided A1C CB to another room, where A1C CB told A1C JA what happened. In the following days A1C CB told several other members of the unit about the incident; however, she did not initially report it to her chain of command or to law enforcement. When A1C CB visited a doctor to ensure she had not contracted a sexually transmitted disease, she told the doctor the intercourse was consensual. A1C CB testified that she suffered nightmares and other effects of the assault that affected her duty performance. As a result, she eventually informed her supervisor, who notified the unit's leadership.

---

[2] SrA TDD was an airman first class at the time of the alleged offense but a senior airman at the time of trial.

The Government also called A1C JA, A1C CB's "best friend," who described the party and saw Appellant help A1C CB up the stairs. A1C JA later went looking for A1C CB and Appellant and eventually noticed the door to one of the upstairs rooms was locked. A1C JA testified she unlocked and opened the door and found A1C CB sitting inside, naked from the waist down with her face in her hands. Appellant was sitting next to her without a shirt on. A1C JA took A1C CB to another room to get dressed. A1C JA testified A1C CB was crying and in broken sentences "just kept saying 'I kept telling him no; it hurt; I wanted him to stop,' that kind of stuff." On cross-examination, A1C JA acknowledged that, when she first entered the room, A1C CB was not crying and had a look of "shock or embarrassment" on her face. A1C JA also acknowledged that A1C CB later told her the reason A1C CB eventually reported the sexual assault was because A1C CB "wanted some free time away from work" and that A1C JA had not noticed A1C CB having any difficulties performing her duties. In addition, the Government introduced evidence that both A1C CB's blood and Appellant's DNA were found on the carpet in the room where the alleged assault took place, testimony from A1C CB's supervisor and another Airman whom A1C CB informed of the assault, and testimony from two witnesses who opined that A1C CB had a truthful character.

The Defense called A1C FK, another Honor Guard Airman who attended the party and spoke with A1C CB the morning after the alleged assault. A1C FK recalled A1C CB told him "[Appellant] and her went upstairs and they locked the door and they were like making out. And then he fingered her and then he started to have sex with her and she said, 'stop,' and he didn't." A1C FK also recalled A1C JA telling him she went upstairs twice looking for Appellant and A1C CB: "The first time she knocked on the door and I believe the response was like, 'we'll be right down.'" When they did not appear after a few minutes, A1C JA "went back upstairs, knocked, and there was no response, so then she unlocked the door and opened it and saw [A1C CB] and [Appellant], like laying on the floor." A1C FK further testified A1C CB later told him she eventually reported the sexual assault "to get out of work" and she did not think it would "blow up into an investigation."

The Defense also called Private First Class (PFC) AK, a female Marine friend of A1C JA and an acquaintance of A1C CB, who attended a gathering at A1C JA's house the day after the alleged sexual assault where A1C CB, Appellant, and others were also present. At this gathering, PFC AK recalled that A1C CB sat next to Appellant and she appeared to be "relaxed" and "having fun" and being "flirty" with him until Appellant spoke on the phone with his girlfriend at the time. At that point, A1C CB stopped dancing and became quiet and "just a little" upset. PFC AK also recalled an occasion prior to the alleged assault when A1C CB announced during a "truth or dare type game" that she

wanted to lose her virginity and that she thought about it a lot. Other witnesses testified about their recollections of how A1C CB described the sexual assault, which varied from A1C CB's trial testimony in certain respects.

## B. A1C AV

A1C AV testified that one night in July 2015, she was drinking alcohol and dancing with Appellant and several other male Airmen in the dormitory. A1C AV was the only female present. The Airmen were playing a drinking game and A1C AV felt Appellant was pressuring her to drink more. In addition, Appellant would come up behind her while she was dancing and pull her hips against his groin, "essentially grinding." When he did this, A1C AV would "pull away" and move to a different part of the room. A1C AV remembered moving to a different dorm room but then "blacked out." Her next memory was of being in a bedroom with Appellant "bending [her] over in front of him." Her next memory after that was of embracing and kissing Appellant. However, she testified the kiss was not "mutual" and she pulled away from Appellant when she "realized who it was" because she was "not attracted" to him. A1C AV testified she told Appellant she wanted him to stop, but he encouraged her and touched her buttocks and breast with his hands over her clothing. A1C AV described herself as "pretty drunk" at this point. She continued to tell him to stop and to push him away. Eventually, she "got away" from him, laid down on the bed, and pretended to sleep. Then A1C AV's roommate, A1C MK, arrived with three male friends and removed A1C AV from the room. One of those friends later reported the incident as a sexual assault. On cross-examination, A1C AV acknowledged that prior to this incident, A1C CB had told her about the alleged sexual assault by Appellant in June of 2015. Two Airmen testified to A1C AV's character for truthfulness.

However, other witnesses described a significantly different version of the incident. A1C TAD, a male friend of A1C AV who was at the gathering and was not drinking, was the Airman who eventually summoned A1C AV's roommate, A1C MK, and two other Airmen to extract A1C AV from the bedroom where she was with Appellant. He described A1C AV and Appellant as mutually "grinding on each other" earlier in the evening. Later, he saw Appellant and A1C AV in the bedroom "standing up, making out" as Appellant touched her buttocks and breast. They were kissing with A1C AV standing on her toes to reach Appellant, and it appeared consensual. He later saw them "on the bed making out," at which point he went for help. When he and the other Airmen tried to remove A1C AV, she argued with them because she wanted to stay. Although A1C TAD did not see anything he thought was "inappropriate" that night, the next day A1C AV told him she "had no memory of what happened." At that point, A1C TAD felt something was "wrong" and reported the incident to his chain of command. Another witness testified that A1C AV appeared to

be consensually kissing Appellant in the bedroom. He and other witnesses also testified to the effect that A1C AV was intoxicated, appeared to be drinking voluntarily, voluntarily danced provocatively with Appellant, and did not want to leave the bedroom where she was with Appellant. An investigator testified that A1C AV told him she knew A1C CB had previously accused Appellant of sexual assault and that her memory of the July 2015 incident was "fuzzy." The Defense also called a forensic psychologist to testify that an individual experiencing a memory blackout can nevertheless knowingly and voluntarily do "almost everything you can do while sober," and that individuals who experience blackouts may "fill in" missing memories based on their own beliefs regarding how they would or would not have acted.

### C. SrA TDD

SrA TDD testified she had a dating relationship with Appellant between April and September of 2015. At some point A1C CB told SrA TDD Appellant "raped" A1C CB at a party; SrA TDD did not know A1C CB well and was "not sure what to believe." In September 2015, SrA TDD "broke up" her relationship with Appellant because she "didn't want to be in a relationship anymore"; however, they subsequently had consensual sexual intercourse on multiple occasions. One night in November 2015, SrA TDD invited Appellant to stay in her dorm on Joint Base Anacostia-Bolling rather than drive back to his room on Joint Base Andrews because he had been drinking alcohol. SrA TDD went to bed wearing a bra, shirt, and underwear. Appellant then removed his clothes and climbed onto the bed. He placed SrA TDD's hand on his genitals twice. Each time, SrA TDD told him "no" and to stop, and removed her hand. SrA TDD testified Appellant then rubbed her thigh and touched her vagina under her underwear. She hit his hand and again told him to stop. SrA TDD testified Appellant then rolled her onto her back, held down her arms, and began grinding his penis against her vagina over her underwear. SrA TDD hit Appellant's arm and told him to stop, which he did after "a minute or so." Appellant then dressed himself and they both remained in the room, sleeping, for the rest of the night. The next morning, SrA TDD told Appellant he "crossed the line" and she "didn't want to talk to him anymore." SrA TDD did not report the incident immediately, but eventually did so. Two witnesses testified to SrA TDD's character for truthfulness.

The Defense called A1C CG, who testified SrA TDD told him a somewhat different version of the incident. According to A1C CG, SrA TDD said Appellant initially came to her room drunk, took off all his clothes, "and started to feel on her" and she told him to stop. Appellant "got mad" and "left" but "came back a little bit later . . . and did the same thing." According to A1C CG, SrA TDD said Appellant "came [back] in, took all of his clothes off again, laid down and started feeling her and she told him no again and he got mad and drove away."

**D. Uncharged Mil. R. Evid. 413 Evidence**

In addition to PFC AK's testimony about A1C CB described above, PFC AK testified on cross-examination about her own interactions with Appellant. Over defense objection, trial counsel elicited that, after PFC AK had been dancing and "grinding" with Appellant, he gave her a "light pat" on the "butt" while she was mixing drinks in A1C JA's kitchen. PFC AK was not "angry" at this "playful exchange" but told him to stop. After more dancing, Appellant touched her buttocks with his hand again in what PFC AK characterized as another playful exchange that did not anger her.

**E. Instructions**

At the close of the Government's case, trial counsel requested the military judge provide the court members "the [Mil. R. Evid.] 413 propensity instruction." The Defense objected to "using the charged offenses as a way to basically bootstrap the other charged offenses" as "inappropriate in this case." After the Defense rested, the military judge *sua sponte* entered a finding of "not guilty" pursuant to Rule for Courts-Martial (R.C.M.) 917 as to the alleged attempted forcible sodomy against A1C CB. The military judge then readdressed the requested Mil. R. Evid. 413 instruction. He declined to give such an instruction with respect to Specification 3 of Charge III, which alleged the abusive sexual contact against A1C AV, stating, "I don't believe that the evidence supports a finding by a preponderance of the evidence that the offense was actually committed."[3] However, the military judge found it was appropriate to instruct that evidence of the sexual assault offenses involving A1C CB and SrA TDD were "admissible as to one another" pursuant to Mil. R. Evid. 413, Mil. R. Evid. 403, and the analysis articulated in *United States v. Wright*, 53 M.J. 476, 482 (C.A.A.F. 2000).

Accordingly, the military judge provided, *inter alia*, the following oral and written instructions to the court members:

> [E]vidence that the accused committed the sexual offenses alleged in Specifications 1, 2, 4 and 5 of Charge II may have no bearing on your deliberations in relation to the other charged sexual offenses, unless you first determine by a preponderance of the evidence, that is more likely than not, the offense alleged in Specifications 1, 2, 4 and 5 of Charge II occurred. If you determine by a preponderance of the evidence any of these offenses occurred, even if you are not convinced beyond a reasonable

---

[3] The military judge declined to enter a finding of "not guilty" on this specification, finding that it survived the "minimal" R.C.M. 917 standard for sufficiency to sustain a conviction.

doubt that the accused is guilty of that offense, you may nonetheless then consider the evidence of those offenses as to which you have so determined for its bearing on any matter to which it is relevant in relation to the remaining sexual offenses. You may also consider the evidence of such other sexual offenses for its tendency, if any, to show the accused's propensity or predisposition to engage in sexual offenses as well as its tendency, if any, to prove that the accused intended to gratify his sexual desires as to those offenses where his intent is in issue and for its tendency, if any, to rebut any inference that the accused's participation in the sexual offenses charged was the result of mistake.

You may not, however, convict the accused solely because you believe he committed these other offenses or solely because you believe the accused has a propensity or predisposition to engage in sexual offenses. In other words, you cannot use this evidence to overcome a failure of proof in the government's case, if you perceive any to exist. The accused may be convicted of an alleged offense only if the prosecution has proven each element beyond a reasonable doubt.

Each offense must stand on its own and proof of one offense carries no inference that the accused is guilty of any other offense. In other words, proof of one sexual offense creates no inference that the accused is guilty of any other sexual offense. However, it may demonstrate that the accused has a propensity to commit that type of offense. The prosecution's burden of proof to establish the accused's guilt beyond a reasonable doubt remains as to each and every element of each offense alleged. Again, proof of one charged offense carries with it no inference the accused is guilty of any other charged offense.

The military judge gave a similar instruction with respect to PFC AK's testimony regarding Appellant's uncharged touching of her buttocks.

Trial counsel stated the following during her rebuttal findings argument:

Members, the defense counsel emphasized to take a break in between when you're thinking about each of these specifications with each of these different young women and to keep separate the evidence and the government does have to prove each element for each specification and prove each specification on its own but the military judge has instructed you that you can consider, you can consider the fact that there are multiple victims in this case. The instruction says, "You may also consider the

evidence to such other sexual offenses for its tendency, if any, to show the accused's propensity or predisposition to engage in sexual offenses, as well as its tendency, if any, to show his intent to gratify his sexual desires and his lack of mistake in these situations."

So while the government does have to prove each specification on its own you don't have to keep them completely separate. So when you're thinking about [A1C CB] think about this instruction, as well. But the military judge has instructed you that the fact that there's more than one victim in this case shows he's inclined to commit sexual offenses; that that's what he does, it's character evidence, it's propensity evidence.

The court members convicted Appellant of Charge II, Specifications 1, 2, and 5, alleging the digital and penile sexual assaults against A1C CB and the aggravated sexual contact against SrA TDD by pressing his penis against her genitalia. The court members acquitted Appellant of Charge II, Specifications 3 and 4, alleging abusive sexual contact by touching A1C AV's breast and buttocks and SrA TDD's genitalia with his hand.

## II. DISCUSSION

### A. Mil. R. Evid. 413

#### 1. Law

The meaning and scope of Mil. R. Evid. 413 is a question of law that is reviewed de novo. *Hills*, 75 M.J. at 354. Instructional errors are also reviewed de novo. *Id.* at 357.

Mil. R. Evid. 413(a) provides that in a court-martial where the accused is charged with a sexual offense, evidence that the accused committed other sexual offenses may be admitted and considered on "any matter to which it is relevant." This includes using evidence of sexual assaults to prove the accused has a propensity to commit sexual assault. *United States v. James*, 63 M.J. 217, 220 (C.A.A.F. 2006).

However, in *Hills* the United States Court of Appeals for the Armed Forces (CAAF) held that evidence of the accused's commission of a sexual assault may not be used in this way if that alleged sexual assault is charged in the same court-martial and the accused has pleaded not guilty to it. 75 M.J. at 356. The CAAF further held that the instructions accompanying the admission of evidence of charged offenses for Mil. R. Evid. 413 purposes implicate fundamental constitutional due process concerns by undermining an accused's presumption

of innocence and the Government's requirement to prove guilt beyond a reasonable doubt. *Id.* at 357. Because "constitutional dimensions are in play," prejudice for such an error must be tested for harmlessness beyond a reasonable doubt. *Id.* In other words, the Government must demonstrate there is no reasonable possibility that the error contributed to the conviction. *Id.*

The CAAF has subsequently emphasized that *Hills* is not to be interpreted narrowly. *See United States v. Hukill*, 76 M.J. 219, 222 (C.A.A.F. 2017) ("[T]he use of evidence of charged conduct as M.R.E. 413 propensity evidence for other charged conduct in the same case is error, regardless of the forum, the number of victims, or whether the events are connected."); *see also United States v. Guardado*, 77 M.J. 90, 2017 CAAF LEXIS 1142, at *7–12 (C.A.A.F. 12 Dec. 2017).

### 2. Analysis

We agree with Appellant that, in light of *Hills*, the military judge erred in instructing the court members that evidence of the sexual assaults charged in the same case, to which Appellant had pleaded not guilty, could, under a preponderance of the evidence standard, be used to find Appellant had a predisposition or propensity to commit sexual assault and, if relevant, thereby contribute to a finding of guilty. Although the military judge's ruling is understandable in light of commonly-held understandings of Mil. R. Evid. 413 prior to the CAAF's decision in *Hills*, we must "apply the clear law at the time of appeal, not the time of trial." *United States v. Mullins*, 69 M.J. 113, 116 (C.A.A.F. 2010) (citation omitted).

The Government concedes the military judge erred, but contends "the strength of the prosecution's case" rendered the error harmless beyond a reasonable doubt. We cannot agree the error was harmless.

There were significant weaknesses in the Government's case supporting the charges of sexual assault against A1C CB. Several witnesses recalled A1C CB telling them versions of the incident that differed in certain respects from her trial testimony. Notably, A1C CB told her doctor the intercourse was consensual. A1C JA testified that when she opened the door to the room, A1C CB was not crying at that point and may have looked "embarrassed." A1C CB told A1C JA and A1C FK she eventually informed her supervisor of the assault because she wanted time off from work; at trial, A1C CB explained this was because she was having difficulty performing her duties, but her "best friend" and co-worker A1C JA noticed no such struggles and no other evidence corroborated this explanation. The Government presented no evidence of any inculpatory statement by Appellant.

Similarly, the Government's case that Appellant committed aggravated sexual contact against SrA TDD was not overwhelming. According to SrA

TDD's own testimony, she and Appellant continued to engage in consensual sex after they "broke up" in September 2015. On the night of the alleged assault, SrA TDD invited Appellant to sleep in her room and apparently to share her bed. SrA TDD testified Appellant persisted in making several physical overtures before holding her by her arms and "grinding" his penis against her vagina, but he stopped "not long" after she hit his arm and told him to stop. At that point, Appellant put his clothes back on and slept in her room for the rest of the night; she did not tell him to leave. Based on the evidence, the military judge specifically instructed the members "[t]he evidence has raised the issue of whether [SrA TDD] consented" to the alleged aggravated sexual contact Appellant was convicted of.

In addition, trial counsel's rebuttal argument heightened the risk that the error contributed to the convictions. She specifically drew the members' attention to the erroneous Mil. R. Evid. 413 instruction and invited the members to rely on it to conclude Appellant had a propensity to commit sexual assault. Relatedly, the nature of the charges and evidence increased the likelihood the members were influenced by the error, which directly reinforced one of the essential strengths of the Government's case: that multiple women accused Appellant of sexual assault. In trial counsel's words, "the fact that there's more than one victim in this case shows he's inclined to commit sexual offenses; that that's what he does."

Furthermore, the same concerns the CAAF articulated in *Hills* and *Guardado* regarding the confusing nature of the Mil. R. Evid. 413 instructions as to evidence of charged offenses are also present here. "The juxtaposition of the preponderance of the evidence standard with the proof beyond a reasonable doubt standard with respect to the elements of the same offenses would tax the brain of even a trained lawyer." *Hills*, 75 M.J. at 358. Thus "the potential for confusion among members was high," creating a risk the members applied an "'impermissibly low standard of proof.'" *Guardado*, 77 M.J. 90, at *11 (quoting *Hills*, 77 M.J. at 357).

The Government contends the fact that the members reached a mixed verdict on the charged sexual offenses "demonstrates that the members analyzed each specification individually and did not allow the evidence supporting a certain offense to 'spillover' into their consideration of the others." However, the CAAF rejected such reasoning in *Guardado*, explaining "[i]t simply does not follow that because an individual was acquitted of a specification that evidence of that specification was not used as improper propensity evidence and therefore had no effect on the verdict." 77 M.J. at *9; *see also United States v. Silva*, No. ACM 38958, 2017 CCA LEXIS 486, at *18–19 (A.F. Ct. Crim. App. 19 Jul. 2017) (unpub. op.).

In light of *Hills* and considering all the evidence, trial counsel's argument, and the instructions, we cannot conclude there is "no reasonable possibility" the error contributed to the verdict of guilty as to Specifications 1, 2 and 5 of Charge II. 75 M.J. at 357. Accordingly, we must set aside these findings.

## B. Additional Confinement Credit

### 1. Additional Background

Appellant was credited with 192 days of pretrial confinement against his adjudged sentence. In addition, the Defense sought three-for-one credit for 14 days Appellant spent in civilian pretrial confinement in the Prince George's County, Maryland, confinement facility, alleging illegal pretrial punishment in violation of Article 13, UCMJ, 10 U.S.C. § 813. The Defense offered affidavits from the two noncommissioned officers who served as Appellant's escorts to and from the civilian confinement facility. One of the affiants, Staff Sergeant (SSgt) SW, provided the following information:

> [Appellant] informed me that during his stay at the county jail, he had been placed in a cell by himself. However, in one of the cells next to him, he could hear the screaming from another male inmate as that inmate was being raped. Upon returning to my unit, I informed my and [Appellant's] commander what [Appellant] had told me. His response was simply "Good!" indicating he was happy [Appellant] had that experience. No remedial actions were taken to ensure [Appellant] did not have to witness any other such assaults. . . .

SSgt SW and the other affiant, SSgt JR, also described themselves and Appellant being subjected to lewd and threatening gestures in close proximity to unrestrained inmates and witnessing violent inmates being beaten and subdued by guards. When the escorts met with their commander shortly before the trial to provide an update on Appellant, the commander greeted them by asking, "How is my favorite criminal doing?"

The Government declined to present any evidence in response. In argument, trial counsel conceded some credit was appropriate but "request[ed] that it not be three-for-one."

The military judge made his displeasure clear:

> Three-for-one credit is not appropriate in this case. I'm granting ten-for-one credit, 140 days of pretrial confinement credit. I cannot recall seeing a more startling and utterly offensive disregard for the health and welfare and wellbeing of one of our fellow members who was at the time presumed to be innocent. Therefore, I hesitate to think that even ten-for-one credit is sufficient

> to communicate how utterly offended I am by the evidence that I've seen in this regard.

### 2. Law

We review de novo the question of whether an appellant is entitled to credit for a violation of Article 13, UCMJ. *United States v. Fischer*, 61 M.J. 415, 418 (C.A.A.F. 2005). "Article 13, UCMJ, prohibits two things: (1) the imposition of punishment prior to trial, and (2) conditions of arrest or pretrial confinement that are more rigorous than necessary to ensure the accused's presence for trial." *United States v. King*, 61 M.J. 225, 227 (C.A.A.F. 2005).

We review de novo alleged Eighth Amendment[4] violations. *United States v. Gay*, 74 M.J. 736, 740 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2016). To demonstrate a violation of the Eighth Amendment, an appellant must show:

> (1) an objectively, sufficiently serious act or omission resulting in the denial of necessities; (2) a culpable state of mind on the part of prison officials amounting to deliberate indifference to [his] health and safety; and (3) that [he] has exhausted the prisoner-grievance system . . . and that he has petitioned for relief under Article 138, UCMJ.

*United States v. Lovett*, 63 M.J. 211, 215 (C.A.A.F. 2006). Pursuant to our broad authority and mandate under Article 66(c), UCMJ, to approve only so much of the sentence as we find appropriate in law and fact, we may grant sentence relief due to the conditions of an appellant's confinement even in the absence of an Eighth Amendment or Article 55, UCMJ, violation. *Gay*, 74 M.J. at 742–43; *see United States v. Tardif*, 57 M.J. 219, 223 (C.A.A.F. 2002).

### 3. Analysis

Appellant contends his commander's "deliberate indifference" to his conditions of confinement violated the Eighth Amendment and seeks 1260 days of additional confinement credit against his sentence. The Government concedes the violence Appellant witnessed in the jail was "troubling" and his commander's comments were "very callous," but contends Appellant fails to demonstrate outrageous Government misconduct[5] or cruel or unusual punishment entitling him to additional confinement credit. We are not persuaded Appellant

---

[4] U.S. CONST. amend. VIII.

[5] The heading for this issue in Appellant's brief refers to "outrageous Government misconduct," but his reliance on *Farmer v. Brennan*, 511 U.S. 825, 833 (1994), and the substance of his analysis indicate his claim is based on the Eighth Amendment's prohibition of cruel or unusual punishment.

suffered a violation of the Eighth Amendment or is otherwise entitled to additional confinement credit on appeal.

Appellant fails to apply the CAAF's well-established test for Eighth Amendment violations set forth in *Lovett*, 63 M.J. at 215. As we apply the three criteria articulated therein, we cannot find Appellant has demonstrated any necessity of life that he was denied, any culpable state of mind on the part of the confinement authorities (as opposed to his commander), or any formal petition for relief through civilian or military channels. *See id.*[6] Recognizing our authority to grant sentence relief, where warranted, even in the absence of cruel or unusual punishment, we nevertheless find additional confinement credit is not appropriate here. *See United States v. Gay*, 75 M.J. 264, 268 (C.A.A.F. 2016). Although the conditions described in the affidavits are disturbing, there is no evidence that Appellant was personally assaulted, physically harmed, or otherwise suffered any adverse health effects; that his ability to present a defense at trial was impaired; or that the correctional authorities responsible for conditions at the facility had any blameworthy intent.

This is not to say we find nothing to deplore here. Like the military judge, we are dismayed by the unit commander's punitive attitude and disregard for the health and safety of a member of his command, particularly because, as the military judge noted, Appellant was a pretrial detainee entitled to a presumption of innocence. However, the unit commander's intent and inaction directly implicate Article 13's prohibition on pretrial punishment rather than the Eighth Amendment prohibition on cruel or unusual conditions of confinement attributable to the confinement authorities. Accordingly, the Defense properly raised and the military judge appropriately addressed this as a matter of illegal pretrial punishment under Article 13, UCMJ. Although the Defense sought three-for-one credit, the military judge awarded ten-for-one credit, thereby unmistakably condemning the commander's actions (and inaction). In light of the evidence presented and the Government's concession that relief was warranted, we find the military judge appropriately exercised his discretion and further relief is not required.

## C. Due Process Right to Timely Appellate Review

### 1. Additional Background

The CAAF's decision in *Hills* was issued on 27 June 2016, 17 days after Appellant's trial concluded and 102 days before the convening authority took

---

[6] Given Appellant's failure to make a prima facie showing of an Eighth Amendment violation, we do not find any post-trial fact-finding is required. *See United States v. Ginn*, 47 M.J. 236, 248 (C.A.A.F. 1997).

action on his court-martial. 75 M.J. 350. Appellant's clemency request contended the convening authority should grant him a new trial in light of *Hills*. The staff judge advocate (SJA) advised the convening authority, *inter alia*, that "the breadth of the holding in [*Hills*] is still unclear and ought to be considered by the appellate courts before rendering the finding of this court invalid." The SJA recommended the convening authority approve the findings and adjudged sentence. The convening authority did so.

### 2. Law

The CAAF has identified four factors to consider in determining whether post-trial delay amounts to a violation of due process rights: (1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of his right to a timely review; and (4) prejudice to the appellant. *United States v. Moreno*, 63 M.J. 129, 135 (C.A.A.F. 2006) (citing *United States v. Jones*, 61 M.J. 80, 83 (C.A.A.F. 2005), *United States v. Toohey*, 60 M.J. 100, 102 (C.A.A.F. 2004)). "No single factor is required for finding a due process violation and the absence of a given factor will not prevent such a finding." *Id.* at 135 (citing *Barker v. Wingo*, 407 U.S. 514, 533 (1972)). In *Moreno*, the CAAF established a presumption of unreasonable post-trial delay where the convening authority does not take action within 120 days of the conclusion of the trial, where the record of trial is not docketed with the service court within 30 days of the convening authority's action, or where the court of criminal appeals does not issue an opinion within 18 months of docketing. 63 M.J. at 142. Even if we find no due process violation, we may exercise our power under Article 66(c), UCMJ, to grant relief for excessive post-trial delay. *Tardif*, 57 M.J. at 224.

### 3. Analysis

Appellant concedes that none of the presumptively unreasonable post-trial processing delays established in *Moreno* have occurred in his case. However, he contends that, although none of these *presumptively* unreasonable delays have occurred, applying the *Moreno* and *Barker* factors to the particular circumstances of his case establishes a violation of his due process rights. In particular, Appellant contends the impact of *Hills* on the findings of his court-martial should have been clear to the SJA, and "[t]his case is only before this Court a year [as of the filing of Appellant's assignments of error] after [Appellant's] court-martial because the government has simply refused to comply with *Hills*." Therefore, Appellant contends, he has suffered prejudice through oppressive incarceration, and he requests to have the findings and sentence set aside or, in the alternative, an order that after any rehearing the convening authority may approve no sentence in excess of a punitive discharge and two years of confinement. We are not persuaded.

We agree with Appellant that a presumptively unreasonable post-trial delay exceeding the timelines established in *Moreno* is not the exclusive measure of unreasonable post-trial delay in violation of an appellant's due process rights. *See United States v. Swanson*, No. ACM 38827, 2016 CCA LEXIS 648, at *20–21 (A.F. Ct. Crim. App. 27 Oct. 2016) (unpub. op.). We further agree with Appellant that, in the absence of a violation of the *Moreno* timelines, the key factor in this case is the reason for the delay. However, we find this factor weighs in favor of, not against, the Government. First, although not addressed by the parties on appeal, the convening authority lacked the authority to set aside the findings; to disapprove, commute, or suspend either the dishonorable discharge or the term of confinement; or to order a rehearing. *See* R.C.M. 1107(c), (d), (e). Even if he possessed such authority, we cannot say the SJA's advice to allow the appellate courts to decide the impact of *Hills* on Appellant's case was unreasonable. At the time the convening authority took action, *Hills* was a relatively new development in the law, and *Hukill* and *Guardado* had not yet been decided. Directing a new trial at that point would have denied the Government the opportunity to present a good faith argument on appeal that the error was harmless in Appellant's case. Accordingly, after weighing the applicable factors, we find no due process violation. *See Moreno*, 63 M.J. at 135.

We have also considered whether to grant additional relief for post-trial delay in the absence of a due process violation; we decline to do so. *See Tardif*, 57 M.J. at 224.

### III. Conclusion

The findings of guilty as to Charge III and its Specification are **AFFIRMED**. The findings of guilty as to Specifications 1, 2, and 5 of Charge II and the sentence are **SET ASIDE**. A rehearing as to the set-aside findings and as to the sentence is authorized. The record is returned to The Judge Advocate General for remand to the convening authority for action in accordance with this opinion.

FOR THE COURT

KATHLEEN M. POTTER
Deputy Clerk of the Court

16